## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

DANIEL M. STODDARD,

     Plaintiff,

v.                                     Civil Action No. 3:22-cv-400

BLUE RIDGE BANK, NATIONAL ASSOCIATION
f/k/a VIRGINIA COMMONWEALTH BANK;
EXPERIAN INFORMATION SOLUTIONS INC.;
EQUIFAX INFORMATION SERVICES, LLC;
and
TRANS UNION LLC,

     Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, DANIEL M. STODDARD ("Plaintiff"), by and through his undersigned Counsel, and alleges the following against Defendants BLUE RIDGE BANK, NATIONAL ASSOCIATION f/k/a VIRGINIA COMMONWEALTH BANK; EXPERIAN INFORMATION SOLUTIONS INC.; EQUIFAX INFORMATION SERVICES, LLC; and TRANS UNION LLC.

### PRELIMINARY STATEMENT

1. This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x.

2. Today in America there are three major consumer reporting agencies, Equifax Information Services, LLC (hereinafter "Equifax"), Trans Union, LLC (hereinafter "Trans Union") and Experian (hereinafter "Experian").

3. The FCRA demands of reporting agencies like Equifax, Experian, and Trans Union, that they utilize reasonable procedures to assure the maximum possible accuracy of the

information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

4.     Consumer reporting agencies ("CRAs") that create consumer reports, like Equifax, Experian, and Trans Union, are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Blue Ridge Bank, N.A. ("Blue Ridge Bank"), particularly where a consumer makes a dispute about information reported.

5.     Also, when a consumer like Plaintiff disputes the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here Blue Ridge Bank. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

6.     Plaintiff brings claims under Section 1681e(b) against all three reporting agencies because they reported about Plaintiff inaccurate information regarding a Blue Ridge Bank mortgage account. When Plaintiff disputed the inaccuracies, the agencies removed inaccurate information only to then permit the reinsertion of the previously deleted information by (1) failing to adopt procedures to prevent reappearance of such information; (2) failing to require Blue Ridge Bank to individually certify the accuracy and completeness of the previously deleted information; and (3) failing to provide prompt notice of the reinsertion to Plaintiff.

7.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017). The CRAs recurrent

failure to prevent the reappearance of false credit reporting information regarding Plaintiff is just one example of the consequences of their underinvestment in accuracy. In addition to violating Section 1681e(b), the CRAs violated specific provisions of Section 1681i enacted as amendments to the FCRA in 1996 specifically to prevent reinsertion.

8.      Likewise, Blue Ridge Bank violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the agencies, removed inaccurate information, and then later reinserted the same inaccurate information in multiple instances.

## JURISDICTION AND VENUE

9.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p.

10.     Venue is proper in this District as a significant portion of the events giving rise to this Complaint occurred in this District and Division, and the Defendants transact business within this District and Division.

## PARTIES

11.     Plaintiff Daniel M. Stoddard is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

12.     Blue Ridge Bank, N.A. f/k/a Virginia Commonwealth Bank is a national charter headquartered in Virginia and regularly conducts business in this District and Division through multiple offices in this District and Division. Blue Ridge Bank sent correspondence to and received communications from Plaintiff via employees located in offices within this District and Division.

13.     Blue Ridge Bank is a "furnisher" of information as defined and governed by 15 U.S.C. § 1681s-2.

14.     Defendant Experian Information Solutions, Inc. is headquartered in California and does business in the Commonwealth of Virginia through its registered agent.

15. Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

16. Defendant Equifax Information Services, LLC is headquartered in Georgia and does business in the Commonwealth of Virginia through its registered agent.

17. Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

18. Defendant Trans Union LLC ("Trans Union") is headquartered in Illinois and does business in Commonwealth Virginia through its registered agent.

19. Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

***Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers***

20. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. See S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *Id*. at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc*., 257 F.3d 409, 414-15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

21. "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

22. "The…FCRA…was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

23. Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

[T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic….

There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA….

Congress surely did not intentionally weave an exception into the fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party….

Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress

clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC*, 617 F.3d 688, 709–10 (3d Cir. 2010).

24.     Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

25.     Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

26.     It has long been the law that a CRA, such as Experian, Equifax, or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the disputed item. *See, e.g., Pinner v. Schmidt*, 805F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-

LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted*, No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

27.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

28.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

29.     Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

This conclusion flows from the plain meaning of both [§ 1681e(b) and § 1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done,

occur or be conceived . . . ." *Id*. at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

30.     It has long been the law – since 1970 in fact – that:

[W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting information from its furnishers that appears implausible or inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

(July 2011), at 67.[1]

31.     Today, furnishers such as Blue Ridge Bank, and other of the CRA Defendants' furnishers, have their own independent duties under the FCRA, principally those found at 15 U.S.C. § 1681s. But while the CRA Defendants' duties under § 1681e(b) were enacted in 1970 and have governed since, the duties on furnishers are much more recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM ACT OF 1996, Pub. L. No. 104-208 (1996).

### *Plaintiff Discovers the CRA Defendants Were Reporting Inaccurate Information Regarding His Mortgage Account*

32.     Between 2006 and 2020, Plaintiff was the co-owner of approximately 7.61 acres located at 95 Hazzard Lane, Lancaster, Virginia 22503 (the "Hazzard Property") and 9.691 acres located on Cox Farm Road, Lancaster, VA 22576 (the "Cox Farm Property"), which secured a mortgage loan (the "Mortgage Loan").

---

[1] *Available at* https://www.ftc.gov/sites/default/files/documents/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations/110720fcrareport.pdf.

33.    In 2015, the Mortgage Loan was still owned by the Bank of Lancaster, located at 100 South Main Street, Kilmarnock, VA 22482.

34.    On or about December 24, 2015, Plaintiff entered into a Forbearance Agreement involving the Hazzard Property and the Cox Farm Property with the Bank of Lancaster.

35.    As part of the consideration given by the Plaintiff to the Bank of Lancaster in connection with the Forbearance Agreement, the Plaintiff and his wife granted the Bank of Lancaster a deed of trust in 3.852 acres on Hazzard Lane, Lancaster, VA 22503 (the "Jacobi Property").

36.    Paragraph 9 of the Forbearance Agreement specifically states:

> The Bank agrees to take reasonable steps to help *protect the Obligors' credit from being negatively impacted by…any deed in lieu of foreclosure and/or the release of any deficiency balance, including, but not limited to, not reporting any such information to any applicable credit reporting agency* (emphasis added).

37.    Pursuant to Articles of Merger (File No. 1703301224) filed with the Virginia State Corporation Commission in 2017, the Bank of Lancaster merged into the Virginia Commonwealth Bank.

38.    In 2016, pursuant to the terms of the Forbearance Agreement, Plaintiff and his wife granted a Deed in Lieu ("Deed in Lieu") in the Jacobi Property to the Bank of Lancaster (then merged with Virginia Commonwealth Bank), resulting in a credit to the Mortgage Loan of $187,500.00. Also pursuant to the terms of the Forbearance Agreement, Plaintiff and his wife sold the Cox Farm Property and applied a substantial portion of the sale proceeds to the Mortgage Loan.

39.    The Deed in Lieu and Cox Farm Property sale did not affect the credit reporting terms of the December 24, 2015 Forbearance Agreement.

40.    Thereafter, Plaintiff and his wife continued to abide by the terms of the Forbearance Agreement.

41. In or around July 2020, Plaintiff and his wife, with written approval from Virginia Commonwealth Bank, sold the Hazzard Property and paid $260,046.00 of the sale proceeds towards the Mortgage Loan. Virginia Commonwealth Bank agreed to accept the $260,046.00 in full satisfaction of the Mortgage Loan.

42. Indeed, a July 28, 2020 letter from Virginia Commonwealth Bank to Plaintiff states: "The attached settlement statement has been reviewed and approved by the Bank. The remaining balance of $60,000 will be forgiven (the "forgiven debt") and the note will be marked paid in full."

43. On December 7, 2020, Virginia Commonwealth Bank recorded a Certificate of Satisfaction as to the Mortgage Loan in the Office of the Clerk of the Circuit Court of Lancaster County.

44. On or about September 2, 2020, Plaintiff received a credit alert advising him of Virginia Commonwealth Bank's derogatory reporting of the Mortgage Loan. Specifically, the account was reporting as charged off with a $60,000 deficiency.

45. On or about September 4, 2020, Plaintiff alerted Virginia Commonwealth Bank to the inaccurate reporting which violated the December 24, 2015 Forbearance Agreement not to perform any derogatory reporting of the Mortgage Loan to the consumer reporting agencies. Virginia Commonwealth Bank agreed to correct its reporting.

46. On or about September 5, 2020, Plaintiff was denied special financing with Anderson Windows Renewal due to the inaccurate reporting on the Mortgage Loan.

47. On September 9, 2020, Sharon C. Faries, Vice President at Virginia Commonwealth Bank located at 1801 Bayberry Ct, Suite 101, Richmond, VA 23226, wrote to Plaintiff stating:

> The above referenced loan was reported on your credit report as charged off on 08/07/2020. We have received your request for the removal of the charge off on

your report and the update has been approved. I have updated the notices that go to the credit bureau and when our month end reporting is done this correction should be reflected in all 3 credit bureau reports.

48. However, on or about October 2, 2020, Virginia Commonwealth Bank again derogatorily reported the Mortgage Loan to the CRAs. This would become a pattern and practice of reinserting the derogatory tradeline on Plaintiff's credit files by Virginia Commonwealth Bank (and its successor, Blue Ridge Bank, N.A.).

49. Pursuant to Articles of Merger (File No. 2101292859027) filed with the Virginia State Corporation Commission in January 2021, Virginia Commonwealth Bank merged into Blue Ridge Bank, N.A.

### *Plaintiff Disputes the Inaccuracies with the CRAs*

50. On or about October 4, 2020, Plaintiff submitted an online dispute to Trans Union regarding the Mortgage Loan, requesting that Trans Union remove the inaccurate, erroneous, and derogatory reporting published by Blue Ridge Bank f/k/a Virginia Commonwealth Bank on his credit files.

51. On or about October 6, 2020, Trans Union forward its investigation results to Plaintiff, stating that it had deleted the Mortgage Loan tradeline from Plaintiff's credit files.

52. On or about October 6, 2020, Plaintiff submitted written disputes to Experian and Equifax requesting that they remove the inaccurate, erroneous, and derogatory reporting published by Blue Ridge Bank on his credit files.

53. On or about November 2, 2020, Equifax forwarded its investigation results to Plaintiff, stating that it had deleted the Mortgage Loan tradeline from Plaintiff's credit files.

54. On or about November 8, 2020, Experian forwarded its investigation results to Plaintiff, updating its reporting by reporting the Mortgage Loan as transferred, closed/never late.

55.     In or around January 2021, as he actively sought financing with First Bank in Brevard, North Carolina for a construction loan, Plaintiff learned that Blue Ridge Bank had reinserted information about the Mortgage Loan to his credit files. Specifically, Blue Ridge Bank was reporting the Mortgage Loan as open with a $60,000 balance and an ongoing monthly payment of $4,960.00.

56.     On February 19, 2021, Virginia Commonwealth Bank sent Plaintiff a letter stating "[d]ue to a credit reporting error the above-mentioned loan account is still showing as open with some credit bureaus."

57.     In mid-January 2022, Plaintiff received a credit reporting alert that Blue Ridge Bank was once again reporting the Mortgage Loan on his credit file with a $60,000 delinquency and as charged off.

58.     On January 19, 2022, Plaintiff obtained a copy of his Experian credit report which showed the Blue Ridge Bank was reporting false, derogatory information about the Mortgage Loan to his credit file. Specifically, Blue Ridge Bank reported that the Mortgage Loan was charged off with $60,000 written off and past due. This Experian report stated that the status for the Mortgage Loan had been updated as of January 2022.

59.     On January 19, 2022, Plaintiff obtained a copy of his Equifax credit report which showed that Blue Ridge Bank was reporting false, derogatory information about the Mortgage Loan to his credit file. Specifically, the Mortgage Loan was reported as "account transferred or sold; charged off account." The reporting further stated that the first delinquency on the Mortgage Loan arose in September 2020.

60. On or about January 20, 2022, Plaintiff submitted written disputes to Experian with a copy to Blue Ridge Bank, requesting that it remove the inaccurate, erroneous, and derogatory reporting published by Blue Ridge Bank on his credit files.

61. On or about January 26, 2022, Plaintiff submitted a written dispute to Equifax with a copy to Blue Ridge Bank, requesting that it remove the inaccurate, erroneous, and derogatory reporting published by Blue Ridge Bank on his credit files.

62. On or about February 23, 2022, Experian forwarded its investigation results to Plaintiff, correcting its reporting by deleting the Mortgage Loan tradeline.

63. Plaintiff has not received a response from Equifax regarding his January 2022 dispute.

### *The CRA Defendants Did Not and Do Not Conduct Any Investigation of Most Consumer Disputes*

64. Unknown to the Plaintiff until this lawsuit, it has long been the practice of Experian, Trans Union, and Equifax to refuse to perform the statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendors located overseas. Both Trans Union and Equifax use the same vendor, previously known as Intelenet Global Services and now as Teleperformance. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mail disputes.

65. If the disputes are made through CRA Defendants' websites, then no further human – overseas or otherwise – touches the dispute at the CRA. The computer takes it from there.

66. These dispute processing vendors are not hired to perform actual FCRA investigations. Instead, the vendors' sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

67.     In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account."). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Experian, Equifax, or Trans Union. It gets sent to the CRA Defendants' creditor customer (such as Blue Ridge Bank) for its sole review and consideration.

68.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication. That mailbox company receives consumer disputes and scans them into a batch of other disputes.

69.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

70.     Both Equifax and Trans Union then forward the dispute mail batches to the same third-party, Teleperformance, based in Mumbai, India. Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

71.     Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

72.     Equifax and Trans Union have taken the position in other litigation that they have no control over the Teleperformance. For example, under oath before another court in 2020, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv*., Case No. 4:19-cv-584, ECF 47-1 (M.D. Fla. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

73.     Trans Union has taken and succeeded with this same position. See, e,g., *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).[2]

74.     Regardless of whether these statements are correct, Equifax, Trans Union, and Experian believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in this District with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue his 1681ifailure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as he alleges against Equifax and Trans Union for their farming-out of investigations to Teleperformance.

75. Equifax, Trans Union, and Experian themselves did not conduct any reinvestigation of Plaintiff's disputes. Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded Plaintiff's Disputes to Blue Ridge Bank, Who Failed to Prevent Reinsertion of Its Inaccurate Reporting

76. In each instance in which each Plaintiff disputed the Blue Ridge Bank account with the CRAs, the CRAs forwarded Plaintiff's disputes to Blue Ridge Bank using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

77. e-Oscar is also the system by which Blue Ridge Bank has agreed it will accept such consumer disputes from the CRAs.

78. Under such circumstances, Blue Ridge Bank became obligated under the FCRA to investigate Plaintiff's disputes.

79. When Plaintiff initially disputed inaccurate credit information regarding the Mortgage Loan to the CRAs in October 2020, Blue Ridge Bank caused the information to be deleted. Plaintiff's initial disputes to the CRAs occurred after Blue Ridge Bank reported false, derogatory information to the CRAs in or around September 2020. Plaintiff directly disputed such reporting with Blue Ridge Bank, and Blue Ridge Bank issued a letter stating that the inaccurate information was or would be corrected.

80. Just three months later, in February 2021, Blue Ridge Bank falsely reinserted that the Mortgage Loan was open with a $60,000 balance and an ongoing monthly payment of $4,960.00.

81. After Plaintiff again disputed the reporting directly with Blue Ridge Bank, Sharon C. Faries, Vice President of Blue Ridge Bank, acknowledged the inaccuracy of the Mortgage Loan

reporting and claimed Blue Ridge Bank attempted to update the reporting but had "found some of the credit bureaus have still not updated [Plaintiff and his wife's] records."

82. In or around January 2022, after numerous direct and indirect credit reporting disputes regarding false, derogatory information reported by Blue Ridge Bank as to the Mortgage Loan, Blue Ridge Bank again reinserted false, derogatory information about the Mortgage Loan in Plaintiff's credit files. Specifically, Blue Ridge Bank reported the Mortgage Loan "account transferred or sold; charged off account."

83. Plaintiff's disputes to Blue Ridge Bank, made in an attempt to have it reinvestigate his disputes and lawfully and permanently correct its credit reporting about the Mortgage Loan failed because Blue Ridge Bank repeatedly reinserted inaccurate information in Plaintiff's credit files.

84. Blue Ridge Bank violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing its representations within Plaintiff's credit files with the CRAs without also including a notation that the information it was reporting as to the Mortgage Loan was disputed and by failing to correctly report results of an accurate investigation to each CRA and to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate reporting.

85. Defendant Blue Ridge Bank violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information for a period of time subsequent to receiving Plaintiff's disputes in October 2020 and prior to the commencement of this action.

### *Plaintiff Suffered Actual Harm*

86. Defendants reinserted derogatory Mortgage Loan credit reporting information in Plaintiff's credit reports, despite being notified that this information was false.

87.     Plaintiff has been attempting to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to permanently correct the inaccurate reporting.

88.     As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

    a.     Stress associated with being denied the ability to finance home repairs, construction, and a boat, and associated delays in applying for future lines of credit;

    b.     Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

    c.     Loss of time attempting to cure the error;

    d.     Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life.

    e.     Stress associated with attempting to resolve this matter in the last year.

    f.     Expenditure of funds for attorney's fees to attempt to ensure Blue Ridge Bank's compliance with its contractual obligations.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of § 1681e(b) of the FCRA - against Experian, Equifax, and Trans Union

89.     The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

90.     Defendants Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

91.     As a result of this conduct, action and inaction of Experian, Equifax, and Trans Union, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

92.     Further, after the Plaintiff's disputes put them on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Experian, Equifax, and Trans Union each ignored such information and did not use any human or substantive review to confirm and verify that their procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

93.     Each Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information and each Defendant did so after receiving notice of these inaccuracies.

94.     Experian, Equifax, and Trans Union's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

95.     As a result of Experian, Equifax, and Trans Union's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

96.     The Plaintiff is entitled to recover his costs and attorney's fees from Experian, Equifax, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## Violation of § 1681i of the FCRA - against Experian, Equifax, and Trans Union

97.     The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

98.     Experian, Equifax, and Trans Union willfully violated 15 U.S.C. § 1681i by reinserting previously deleted information without obtaining certification from Blue Ridge Bank that the reinserted information was complete and accurate; by failing to provide written notice to Plaintiff of the reinsertion of inaccurate information from Blue Ridge Bank not later than five business days after such reinsertion; by failing to provide Plaintiff with a statement that the disputed information has been reinserted and the business name, address, and telephone number of Blue Ridge Bank; by failing to provide Plaintiff with notice that Plaintiff had the right to add a statement to Plaintiff's credit file disputing the accuracy or completeness of the disputed information; and by failing to maintain reasonable procedures to prevent the reappearance in Plaintiff's credit file of previously deleted information regarding the Mortgage Loan.

99.     As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n.

100.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

101.    The Plaintiff is entitled to recover his costs and attorneys' fees from Experian, Equifax, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### Violation of § 1681s-2(b)(1)(C) and (D) of the FCRA – against Blue Ridge Bank

102. The Plaintiff realleges and incorporates the foregoing paragraphs above as if fully set out herein.

103. Defendant Blue Ridge Bank violated 15 U.S.C. § 1681s-2(b)(1)(A) by publishing its representations within Plaintiff's credit files without also including a notation that the Mortgage Loan account was disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency and to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate reporting.

104. As a result of this conduct, action and inaction of Blue Ridge Bank, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

105. Blue Ridge Bank's conduct, action and inaction was willful and it is liable for actual or statutory damages and punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n.

106. The Plaintiff is entitled to recover his costs and attorneys' fees from Blue Ridge Bank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT IV**
**Violation of § 1681s-2(b)(1)(E) of the FCRA – against Blue Ridge Bank**

107. Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

108. Defendant Blue Ridge Bank violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Experian, Equifax, and Trans Union and prior to the commencement of this action.

109.     As a result of this conduct, action and inaction of Blue Ridge Bank, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from credit, reduction in credit scores, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

110.     Blue Ridge Bank's conduct, action and inaction was willful, alternatively, negligent and it is liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

111.     The Plaintiff is entitled to recover his costs and attorneys' fees from Blue Ridge Bank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT V
### Defamation – against Blue Ridge Bank

112.     Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

113.     Blue Ridge Bank recklessly, maliciously, and/or intentionally published and disseminated false and inaccurate information concerning Plaintiff with knowledge of the falsity and inaccuracy of the matters reported or reckless disregard for the truth of the matters reported.

114.     The false and inaccurate information reported by Blue Ridge Bank constituted defamation against Plaintiff.

115.     As a result of this conduct, action and inaction of Blue Ridge Bank, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from credit, reduction in credit scores, and denial for various financial products, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

116.     Plaintiff is entitled to recover actual and punitive damages against Blue Ridge Bank in an amount to be determined by the Court.

## COUNT VI
### Breach of Contract – against Blue Ridge Bank

117.     Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

118.     Blue Ridge Bank repeatedly breached the Forbearance Agreement by failing to take reasonable steps to prevent damage to Plaintiff's credit by furnishing false, highly derogatory reporting about the Mortgage Loan.

119.     As a result of this conduct, action and inaction of Blue Ridge Bank, Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from credit, reduction in credit scores, and denial for various financial products, and other harm.

120.     Plaintiff is entitled to recover actual damages against Blue Ridge Bank in an amount to be determined by the Court.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against Defendants; for his attorneys' fees and costs; for prejudgment and postjudgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.

Respectfully Submitted,

**DANIEL M. STODDARD**

By: ___/s/ Leonard A. Bennett___
Leonard A. Bennett, VSB #37523
Craig Marchiando, VSB #89736
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
Email: craig@clalegal.com

Drew D. Sarrett, VSB# 81658
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, VA 23219
Telephone: (804) 528-5758
Facsimile: (757) 930-3662
Email: drew@clalegal.com

*Counsel for Plaintiff*